No. 34,019

The State of Kansas, *Appellee*, v. L. F. Barger, *Appellant*.

(83 P. 2d 648)

Opinion filed November 5, 1938.

*William H. McHale* and *Justus N. Baird,* both of Kansas City, for the appellant.

*Clarence V. Beck,* attorney general, *C. Glenn Morris,* assistant attorney general, *Arthur J. Stanley, Jr.,* county attorney, and *E. A. Schalker,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

ALLEN, J.: The defendant was found guilty of obtaining money from Charles A. Beeler and Lottie Beeler by means of and by the use of false and fraudulent representations, in violation of our statute G. S. 1935, 21-551, and appeals.

The facts established by the state may be summarized as follows:

Charles A. Beeler is a locomotive engineer and has been employed by the Atchison, Topeka & Santa Fe Railway Company since the year 1890. At the time of the trial he was 68 years of age. The defendant was introduced to Mr. Beeler by a man named Barber, at Beeler's home, about fifteen days prior to June 6, 1936.

On June 6, 1936, the defendant came to the Beeler home and told Beeler and his wife that he had a money-making proposition at the state lake at Tonganoxie to supply it with electricity and water, and that he had a 99-year franchise; that he had a contract with the city of Jarbalo to furnish electricity there; "that he had all those things lined up, Senator Miller, with the state utility people, with the Kansas Power & Light Company, with Jarbalo, and with lighting the dam."

Mrs. Lottie Beeler testified that the defendant had said that he "had a franchise on the ground around the state lake and that he had the privilege of putting electricity in the several different homes around there and supplying them with light, and that all he needed was the money to put this in, and he had the contract of putting in lights for Senator Miller, and he also had the poles in from the line down to Senator Miller's farm. He seemed to have a large farm with a barn, a house, and a small house, and he had a contract for to put the lights in at Jarbalo."

The Beelers, before their transaction with the defendant, owned some stock in the Federal Reserve Life Insurance Company, the Argentine Building & Loan Association, and the Guarantee Building & Loan Association of Dallas, Tex. The par value of the building

and loan stock was $7,290, and there were certain shares of stock in the Federal Reserve Life Insurance Company.

On June 6, 1936, a written contract was entered into between the defendant Barger and his wife, first parties, and Beeler and his wife, second parties. The contract recited that the Bargers were the owners of a 99-year franchise to furnish power, light and water to the Flint addition, consisting of 85 acres adjoining the state lake park in Leavenworth county; that the Beelers were the owners of building and loan and life insurance stock of the total value of $8,-390; that the Beelers agreed to sell their stock to the Bargers and agreed to take the note of the Bargers for the $8,390, payable in one year with interest, payment to be secured by assignment of one-half interest in the franchise; upon payment of the note the Beelers were to receive one fourth of the net proceeds of the franchise for the life of the franchise.

On the same date the Beelers turned over to the defendant their building and loan and life insurance stock, at a valuation of $8,-390, fixed by the defendant. The defendant told the Beelers that every cent of the money realized from the sale of the stock would be put into his proposition and that there was no way for them to lose, because their money would be in it and they were the owners of a half interest in the franchise by virtue of an assignment of interest given them by the defendant. The Flint property covered by the franchise consists of 85 acres of land near the Tonganoxie state lake and had two houses on it.

At the time the defendant obtained the stock from the Beelers he did not have any contract to furnish electric power to Senator Miller; he had no contract or no arrangements to furnish power to the town of Jarbalo; he had no contract, agreement or understanding with the Kansas Electric Power Company, under the terms of which power would be furnished to him for his proposed line; he did not have a certificate of convenience from the Corporation Commission of Kansas.

On October 8, 1936, the defendant was arrested, charged with obtaining the stock from the Beelers by false pretenses. After that date the defendant visited Senator Miller and Mr. Jaseph, of Jarbalo, and obtained from them letters indicating that he had discussed the establishment of power lines with them. After June 6, 1936, and on July 17, 1936, the defendant obtained a certificate of convenience to transact the business of an electric utility in a territory near the

state lake. The territory described in his certificate of convenience does not include and is nowhere near the town of Jarbalo, and does not include the Miller farm nor the state lake property.

After June 6, 1936, and on July 31, 1936, the defendant entered into a contract with the Kansas Electric Power Company under the terms of which the defendant was to purchase electric energy from that company for a period of one year.

On July 6, 1936, the defendant paid the amount due on a note secured by a mortgage on the defendant's home in the sum of $1,300, and after June 6, 1936, the defendant paid the amount necessary to secure the release of a mortgage on his son's car.

At the time he obtained the stock from the Beelers the defendant gave to the Beelers a promissory note signed by himself and bearing the signature of Elizabeth Barger. The signature of Elizabeth Barger appears also on the assignment of interest in the Flint franchise and on the contract between Barger and the Beelers. The Beelers were told that this was the signature of Barger's wife; it later developed that the Elizabeth Barger who signed the contract, note and assignment was the daughter-in-law of the defendant.

About six weeks after the Beelers had surrendered their stock to the defendant he came to their home to ask for more money. The Beelers, having begun to suspect that all was not as it should be, questioned him and demanded the return of the money realized from the sale of their stock. The defendant told them to "shoot their wad."

1. The defendant complains that the only evidence supporting the allegations of the information was the testimony of the complaining witness and his wife. "In general, the testimony of a *single witness*, no matter what the issue or who the person, *may legally suffice as evidence upon which the jury may found a verdict.*" (4 Wigmore on Evidence, 2d ed., § 2034.)

Credibility does not depend on the number of witnesses. The verdict of the jury does not proceed solely on the story told by a witness, but on the moral conviction of its truth, based on its intrinsic probability and his manner of giving his evidence. Besides, the statement of these witnesses was corroborated by the presumption arising from the absence of counter proof or explanation. (See 16 C. J. 760.)

2. Appellant contends the court erred in overruling defendant's motion to strike the first amended information from the record. He

argues that after the state had failed to amend within the time permitted to amend there was nothing left to amend. The defective information had not been stricken from the files, nor had the proceedings been dismissed. An amendment of substance as well as to form has been held permissible where it did not affect the substantial rights of the defendant. (*State v. Morris*, 131 Kan. 282, 291 Pac. 742.) The subsequent action of the court showed consent to have the information amended after expiration of the time originally granted. It is not shown that the allowance of the amendment in any way prejudiced the defendant in making his defense. The point is not well taken.

3. Appellant maintains that the court erred in overruling his motion to be discharged for the reason that more than three terms had intervened since the filing of the information. The statute G. S. 1935, 62-1432, provides that where a person charged with an offense shall not be brought to trial before the end of the third term of the court in which the cause is pending is entitled to be discharged "unless the delay happen on his application or be occasioned by the want of time to try such cause at such third term."

The defendant was first tried at the fourth term held after the information was filed. An examination of the record shows that prior to his trial the defendant had filed four motions attacking the information. Each of these motions required preparation and argument, and the information was amended three separate times to meet defendant's objections.

In *State v. Lewis*, 85 Kan. 586, 118 Pac. 59, this court, in construing G. S. 1935, 62-1432, stated:

"It is not essential, under this statute, that the application should be one specifically for delay. It is sufficient if some application on the part of the defendant necessarily and directly cause the delay to happen. The word 'application' is not to be restricted to its literal, etymological meaning. In the case of *The State v. Dewey*, 73 Kan. 739, 741, 88 Pac. 881, it was said that it signifies means to accomplish an end and denotes affirmative action, not passive submission. In this case the defendant's objection was an affirmative act interposed as a means to prevent a trial before the judge *pro tem*. A postponement of the trial was inevitable, and consequently happened on the defendant's application." (p. 589.)

In the case at bar the motions attacking the informations served the purpose of delaying trial until disposed of and until the state amended to meet the objections raised. In filing these motions the

defendant effectively postponed the time of trial on his own application within the meaning of G. S. 1935, 62-1432.

Was the delay occasioned by want of time to try such cause at such third term?

The third term held after the information was filed in this case was the September (1937) term of the district court. During that term the defendant filed a motion to strike the amended information from the record. This motion was argued and overruled by the court on November 22, 1937, shortly before the end of the September term.

On the same date a general order of continuance was entered in the journal of division No. 4 of the district court, which recited that because of lack of available funds it was impractical to call an extra jury panel before the commencement of the December term of court; that no person charged with crime was demanding immediate trial and for that reason all criminal cases then pending in the district court of Wyandotte county were continued for the term "because of want of time to try each case."

This order amounts to a finding by the judge of the criminal division of the district court of Wyandotte county that all delays in the trial of criminal cases then pending in that court were occasioned by the want of time to try such cases during that term within the meaning of G. S. 1935, 62-1432.

It is clear, therefore, that the delay in the trial of the case was on the application of the defendant, and for want of time to try the case at the third term of the court held after the information was filed.

4. It appears the amended information had been amended by interlineation by leave of the court, and thereafter had not been resubscribed, reverified and refiled. As stated above, in the original information the defendant had been charged in the language of the statute. It charged that the appellant did "unlawfully, willfully and feloniously, with intent to cheat and defraud one Charles A. Beeler and one Lottie Beeler by means and by use of false and fraudulent representations, statements and pretenses, . . . to wit" (setting forth the representations) and obtained from the Beelers property described of the value of $8,390. The words interlined "by means of said false and fraudulent statements" and also that the representations were false, etc., did not add to or take from the charge previously made. The words were evidently inserted to meet the re-

peated attacks of defendant. The interlined amendments were surplusage. There was no error in refusing to quash the amended information. (*State v. Morris,* supra; *State v. Fleeman,* 102 Kan. 670, 171 Pac. 618; G. S. 1935, 62-1718.)

5. It is asserted the court erred in refusing to give instructions requested by defendant. The instructions given by the court are not set forth in the abstract. In this situation this court will presume that the instructions given were correct and fully covered the law of the case. (*Rierson v. Southern Kansas Stage Lines Co.,* 146 Kan. 30, 69 P. 2d 1.)

6. It is claimed that error was committed in overruling defendant's motion to discharge the defendant for the reason the evidence did not show that a public offense had been committed. From the evidence as outlined above it appears that the representations related to then existing facts or past events, and constituted false pretenses as often defined by this court. (*State v. Briggs,* 74 Kan. 377, 86 Pac. 447; *State v. Clark,* 46 Kan. 65, 26 Pac. 481; *State v. Matthews,* 44 Kan. 596, 25 Pac. 36; *In re Snyder, Petitioner, &c.,* 17 Kan. 542.)

From the record there can be no doubt that the false pretenses charged were in fact made, that they were made for the purpose of cheating and defrauding the Beelers, and that the Beelers were in fact cheated and defrauded to the extent charged. While it is true the Beelers accepted the note mentioned in the contract, there is ample evidence that they parted with their property by reason of the false representations made to them by the appellant. It is not necessary to a conviction that the false pretenses be the sole inducement to the obtaining of the money or property. (*State v. Briggs,* supra.)

We have examined other errors assigned, but there is nothing substantial in them. As no error is found, the judgment is affirmed.